IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRYANT WITHERSPOON,                  :               CIVIL ACTION
                                     :
        Plaintiff,                   :
                                     :
        v.                           :
                                     :               NO. 18-4352
ANDREW SAUL,[1]                      :
Commissioner of Social Security,     :
                                     :
        Defendant.                   :

## MEMORANDUM OPINION

Bryant Witherspoon ("Witherspoon" or "Plaintiff") seeks review, pursuant to 42 U.S.C.

§ 405(g), of the Commissioner of Social Security's ("Commissioner") decision denying his

claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[2]

For the reasons that follow, Witherspoon's Request for Review will be DENIED.

## I.      PROCEDURAL HISTORY AND BACKGROUND

Witherspoon was born on October 10, 1964.  R. at 23.[3]  He has at least a high school

education and is able to communicate in English.  Id.  He has previous work experience as a

maintenance food service worker, kitchen helper, and security guard.  Id.  On May 5, 2014,

Witherspoon protectively filed applications for DIB pursuant to Title II of the Social Security

---

[1]     Andrew Saul, the current Commissioner of Social Security, has been automatically
substituted as the Defendant in this case pursuant to Fed. R. Civ. P. 25(d).

[2]     In accordance with 28 U.S.C. § 636(c), the parties voluntarily consented to have the
undersigned United States Magistrate Judge conduct proceedings in this case, including the entry
of final judgment.  See Doc. Nos. 3, 7.

[3]     Citations to the administrative record will be indicated by "R." followed by the page number.

Act (the "Act") and for SSI pursuant to Title XVI of the Act. Id. at 15. He alleged that he had

become disabled on August 30, 2013 due to depression, bipolar disorder, and anxiety. Id. at 53.

His applications were initially denied on September 25, 2014. Id. at 15. Witherspoon then filed

a written request for a hearing on November 24, 2014. Id. A hearing before an Administrative

Law Judge ("ALJ") was held on January 19, 2017. Id. at 34-52. On May 2, 2017, the ALJ

issued an opinion finding that Witherspoon was not disabled. Id. at 12-30. Witherspoon filed a

timely appeal with the Appeals Council on May 12, 2017. Id. at 131-33. On August 27, 2018,

the Appeals Council denied Witherspoon's request for review, thereby affirming the decision of

the ALJ as the final decision of the Commissioner. Id. at 1-6. Witherspoon then commenced

this action in federal court.

## II.     THE ALJ'S DECISION

To prove disability, a claimant must demonstrate some medically determinable basis for a

physical or mental impairment that prevents him or her from engaging in any substantial gainful

activity for a 12-month period. 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). As explained in the

applicable agency regulation, each case is evaluated by the Commissioner according to a five-step

process:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled. (ii) At the
> second step, we consider the medical severity of your impairment(s). If you do
> not have a severe medically determinable physical or mental impairment that
> meets the duration requirement in § 404.1509, or a combination of impairments
> that is severe and meets the duration requirement, we will find that you are not
> disabled. (iii) At the third step, we also consider the medical severity of your
> impairment(s). If you have an impairment(s) that meets or equals one of our
> listings in appendix 1 to subpart P of part 404 of this chapter and meets the
> duration requirement, we will find that you are disabled. (iv) At the fourth step,
> we consider our assessment of your residual functional capacity and your past
> relevant work. If you can still do your past relevant work, we will find that you
> are not disabled. (v) At the fifth and last step, we consider our assessment of
> your residual functional capacity and your age, education, and work experience

to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920 (references to other regulations omitted).

In his decision, the ALJ found that Witherspoon suffered from the following severe impairments: depression and degenerative disorders of the spine. R. at 17. The ALJ did not find that any impairment, or combination of impairments, met or medically equaled a listed impairment and determined that Witherspoon retained the residual functional capacity ("RFC") to:

> [P]erform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can do no more than occasional crawling, kneeling, stooping, and climbing of stairs, and he cannot be exposed to unprotected heights. He is capable of sustaining attention for at least two-hour increments throughout an eight-hour workday. He cannot understand, remember or apply complex instructions or work procedures. He possesses the ability to adapt and manage himself sufficiently to tolerate usual work conditions and understand, remember and apply routine work procedures and instructions. He is capable of interacting with coworkers, supervisors, and the public on a less than frequent but more than occasional basis.

Id. at 19. Based on this RFC determination, the ALJ concluded that Witherspoon was unable to perform any past relevant work. Id. at 23. However, relying on the vocational expert who appeared at the hearing, the ALJ found that there were jobs that existed in significant numbers in the national economy that Witherspoon could perform, such as a sorter of small products, an assembler, and an inspector. Id. at 24. Accordingly, the ALJ concluded that Witherspoon was not disabled. Id.

## III.   WITHERSPOON'S REQUEST FOR REVIEW

In his Request for Review, Witherspoon contends that the ALJ's RFC determination was not supported by substantial evidence because: (1) the ALJ improperly discounted the opinions of his primary care physician, Vincent Baldino, D.O., and consultative examiner, Floyretta

Pinkard, M.D.; (2) the ALJ improperly discounted the nature and extent of Witherspoon's severe mental impairments; and (3) the ALJ failed to consider the impact of Witherspoon's obesity and fatigue on his ability to perform sustained light work.

## IV.  DISCUSSION

### A.  Social Security Law

The role of the court in reviewing an administrative decision denying benefits in a Social Security matter under 42 U.S.C. § 405(g) is "limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact." Schwartz v. Halter, 134 F. Supp. 2d 640, 647 (E.D. Pa. 2001); see also Richardson v. Perales, 402 U.S. 389, 401 (1971); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir. 1985).  Substantial evidence is a deferential standard of review.  See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  It is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (internal quotation marks omitted); see also Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (Substantial evidence "'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting Pierce v. Underwood, 487 U.S. 552, 564-65 (1988))).  A reviewing court may not undertake a de novo review of the Commissioner's decision in order to reweigh the evidence. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir. 1986).  The court's review is plenary as to the ALJ's application of legal standards.  Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).

**B.** **The ALJ Did Not Err in Evaluating the Opinions of Drs. Baldino and Pinkard**

Witherspoon contends that the ALJ's RFC assessment was not supported by substantial evidence because the ALJ did not properly evaluate the opinions of his treating physician, Dr. Baldino, or consultative examiner, Dr. Pinkard. Pl.'s Br. (Doc. No. 13) at 3-10. This argument lacks merit.

Under the applicable regulations and controlling case law,[4] "opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)); accord 20 C.F.R. § 416.927(c)(2). A treating physician's opinion on the nature and severity of a claimant's impairment will be given controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If an ALJ does not afford a treating physician's opinion controlling weight, he or she may instead give it "more or less weight depending upon the extent to which supporting explanations are provided." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). Factors to be considered by the ALJ in assigning appropriate weight to a medical opinion include the following: the length of the treating relationship and frequency of examination; the nature and extent of the treating relationship; supportability; consistency; specialization; and other relevant factors. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

In rejecting a physician's assessment, however, an ALJ may not make "speculative

---

[4]    The Social Security Administration amended its regulations regarding how to assess treating source opinions for claims filed on or after March 27, 2017. See 82 F.R. 5844, 5869 (Jan. 18, 2017); see also 20 C.F.R. §§ 404.1520c, 416.920c. Because Witherspoon's claims were filed on May 5, 2014, see R. at 15, the new rules do not apply here.

inferences from medical reports" and may not reject a treating physician's opinion "due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F.3d 310, 317-18 (3d Cir. 2000) (internal quotation marks omitted). An ALJ must explain on the record his or her reasons for disregarding a physician's opinion. Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986). While it is essential that an ALJ set forth reasons for his or her decision, an ALJ is not required to use particular language or adhere to a specific formula or format in conducting the analysis. Jones, 364 F.3d at 505. The ALJ need only provide a "'discussion of the evidence' and an 'explanation of reasoning' for his [or her] conclusion sufficient to enable meaningful judicial review." Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009) (quoting Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)). Here, the ALJ provided an adequate explanation of his bases for affording "partial" and "little" weight to the opinions of Witherspoon's treating physician, Dr. Baldino, and consultative examiner, Dr. Pinkard, and the record demonstrates that his decision was supported by substantial evidence.

### 1.    Dr. Baldino

Dr. Baldino, Witherspoon's primary care physician, completed a form entitled "Medical Opinion re: Ability to do Work-Related Activities (Physical)" on January 20, 2017. R. at 576-77. He opined that Witherspoon had the ability to lift and carry 10 pounds on a frequent basis and to stand and walk for approximately two hours and sit for approximately two hours in an eight-hour workday. Id. at 576. Dr. Baldino determined that Witherspoon could only sit 20 minutes or stand 10 minutes before needing to change positions. Id. He also found that Witherspoon would need to walk around every 10 minutes for five minutes at a time and that he needed the opportunity to shift at will from sitting or standing/walking. Id. In addition, Witherspoon would need to lie down every 10 to 20 minutes during an eight-hour working shift.

Id.  In support of these restrictions, Dr. Baldino referenced Witherspoon's "L5 radiculopathy on EMG."  Id.  He further opined that Witherspoon could occasionally twist, stoop or bend, crouch, and climb stairs, but never climb ladders.  Id. at 577.  Once again, he cited to the "lumbar radiculopathy on EMG" as well as "spinal [and] PVM tenderness/spasm."  Id.  Dr. Baldino also noted that Witherspoon could not push or pull due to his lumbar disc disease, noting his "L/S PVM tenderness" and positive straight leg test.  Id.  Finally, Dr. Baldino concluded that Witherspoon would be absent more than four days per month as a result of his impairments.  Id.

The ALJ accorded Dr. Baldino's opinion "partial weight only," explaining that the opinion "is accepted only to the extent it is consistent with the established residual functional capacity, and is otherwise found to exaggerate the claimant's limitations."  Id. at 23.  The ALJ concluded that, specifically, "[t]he assessment of an ability to stand/walk two hours and sit two hours in an eight-hour day, the need to switch positions frequently throughout the workday, and expected absence of more than four days per month is not supported by the non-acute examination and test findings and record of conservative treatment."  Id.

As an initial matter, Witherspoon claims that the ALJ erred by failing to explain which restrictions he did and did not accept when evaluating Dr. Baldino's opinion.  Pl.'s Br. at 5-6.  The ALJ, however, specifically identified that he did not accept Dr. Baldino's opinion to the extent that Dr. Baldino opined that Witherspoon could only stand or walk two hours and sit two hours in an eight-hour day, would need to switch positions frequently throughout the day, and be absent more than four days per month.  R. at 23.  Moreover, the ALJ adequately explained his decision to afford Dr. Baldino's opinion only partial weight based on the examination findings and record of conservative treatment, which was supported by substantial evidence.  For example, as summarized by the ALJ, Witherspoon had a number of emergency room visits for

various complaints as substantiated by his medical records.  Id. at 20-21.  On July 3, 2014,

Witherspoon was seen at Thomas Jefferson University Hospital's ("Jefferson") Emergency

Department with a complaint of wrist and knee pain after falling the day before.  Id. at 362.

However, it was noted that he was able to stand and walk immediately after the fall, id. at 363,

and upon physical examination it was noted that he was able to ambulate without difficulty, was

in no acute distress, and had no obvious discomfort, id. at 362.  His medical records indicated

that he had a history of chronic lower back pain which was treated with "low level[s]" of

Percocet.  Id. at 363, 490.

In December 2014, Witherspoon was seen by a primary care physician for "a variety of

concerns," id. at 487, including "[u]nspecified backache," id. at 488.  However, upon physical

examination, he was in no acute distress.  Id.  At his visit, he "demanded an mri of the lumbar

spine, requesting one of his entire spine.  He would not accept that a back specialist could help

determine th[e] best imag[i]ng modality and views."  Id.  Accordingly, he was referred for an

MRI of the lumbar spine.  Id.  On January 28, 2015, Witherspoon received an MRI of his lumbar

spine, which resulted in an impression of "malalignment."  Id. at 455.  In particular, the MRI

findings indicated:

> At L2-L3 there is a disc bulge impressing on the thecal sac.  There is moderate
> facet overgrowth.  There is ligamentum flavum infolding impressing on the
> posterior thecal sac.  There is moderate lateral recess narrowing (subarticular
> stenosis).  There is mild to moderate central spinal canal narrowing.  There is
> moderate neural foraminal narrowing.
>
> At L3-L4 there is a disc bulge impressing on the thecal sac.  There is moderate
> facet overgrowth.  There is ligamentum flavum infolding impressing on the
> posterior thecal sac.  There is moderate lateral recess narrowing (subarticular
> stenosis).  There is moderate central spinal canal narrowing.  There is moderate to
> severe right and moderate left neural foraminal narrowing.
>
> At L4-L5 there is a disc bulge impressing on the thecal sac.  There is moderate
> facet overgrowth.  There is ligamentum flavum infolding impressing on the
> posterior thecal sac.  There is moderate lateral recess narrowing (subarticular

stenosis).  There is moderate central spinal canal narrowing.  There is moderate to severe neural foraminal narrowing.

At L5-S1 there is a disc bulge impressing on the epidural fat.  There is moderate facet overgrowth.  There is moderate lateral recess narrowing (subarticular stenosis).  There is mild to moderate central spinal canal narrowing.  There is moderate neural foraminal narrowing.

Id.  Witherspoon also received an EMG on April 1, 2015, which resulted in the following findings: "1. Motor nerve analysis is normal and symmetric.  2.  Late responses are normal and symmetric.  3.  Sensory nerve analysis is normal and symmetric.  4.  EMG reveals evidence of moderate denervation in skeletal muscle territories subserved by the L5 nerve roots."  Id. at 458.  The impression stated that "[t]his is an abnormal study, which is confirmatory of bilateral L5 radiculopathy."  Id.  The doctor who performed the EMG stated in a letter that he had "determined that [Witherspoon] has suffered with aggravation of degenerative joint disease at L4-5, as a direct consequence" of an unidentified accident that occurred on December 4, 2014.  Id.  The doctor indicated that "[l]umbar epidural steroidal injections under fluoroscopic guidance will be scheduled along with continued chiropractic care."  Id.

Nevertheless, Witherspoon's medical records consistently indicate that he had normal ranges of motion and the ability to stand and walk without difficulty or the use of assistive devices.  For example, on May 16, 2014, Witherspoon was seen at the Emergency Department of Lankenau Hospital for complaints of headaches and facial pain.  Id. at 342.  Upon physical examination, it was noted that he was in no acute distress, had a "normal inspection" of his back, and his extremities had a normal range of motion.  Id. at 343.  On July 3, 2014, Witherspoon was seen at Jefferson's Emergency Department after suffering from a fall.  Id. at 362.  He was noted to be in no acute distress, id., and upon physical examination it was noted that he had "5/5 strength x4 ext, able to stand and walk without assistance" and had "full passive and active ROM," id. at 364; see also id. at 389 (gait noted to be stable and movement within normal

limits).  Additional records from Jefferson in 2015 similarly document multiple encounters with minor complaints, where Witherspoon was observed to be in no acute distress or obvious discomfort upon physical examination.  See, e.g., id. at 581-82, 584, 586, 626, 628.  Moreover, during a visit on April 7, 2015, it was noted that he had "no back tenderness" and a full range of motion.  Id. at 628.  Consequently, although the MRI revealed "multilevel disc bulge with impingement and some forminal narrowing," and the EMG showed evidence of bilateral L5 radiculopathy, the ALJ's overall characterization of "non-acute examination and test findings," id. at 23, was supported by substantial evidence in the record.  The record similarly supported the ALJ's conclusion that Witherspoon's treatment for his back pain was largely conservative, consisting primarily of low doses of prescription pain medication.  Id. at 23, 363, 490.  Indeed, Witherspoon testified at the hearing before the ALJ that he was not currently in treatment for any back issues.  Id. at 41-42.

Witherspoon's contention that the ALJ rejected Dr. Baldino's expert professional judgment on the basis of his own lay judgment, Pl.'s Br. at 6-7, is unpersuasive.  Social Security regulations expressly direct an ALJ to consider both whether a physician provides evidence to support his or her opinion, 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3), and the extent to which the opinion is consistent with the record as a whole, id. §§ 404.1527(c)(4), 416.927(c)(4).  "[T]he [United States Court of Appeals for the] Third Circuit has also repeatedly held that when a treating physician's notes, analyzed as a whole, contradict the physician's opinion on a claimant's ability to work, an ALJ may properly rely on those notes in determining that the opinion is entitled to little or no weight."  Smith v. Astrue, 961 F. Supp. 2d 620, 643 (D. Del. 2013) (citing Dula v. Barnhart, 129 F. App'x 715, 719 (3d Cir. 2005); Humphreys v. Barnhart, 127 F. App'x 73, 76 (3d Cir. 2005)); see also Shelton v. Astrue, No. 11-75J, 2012 WL 3715561,

at *3 (W.D. Pa. Aug. 28, 2012); <u>Petrowsky v. Astrue</u>, No. 10-563-SLR, 2011 WL 6083117, at *14-15 (D. Del. Dec. 6, 2011).  By comparing Dr. Baldino's opinion with Witherspoon's medical records, the ALJ was not usurping the role of a medical source, but was merely performing his assigned judicial function.  <u>Zapata-Alvarez v. Colvin</u>, No. 14-2830, 2015 WL 5179477, at *7 (E.D. Pa. Sept. 4, 2015) (ALJ finding medical opinion inconsistent with record was not substituting lay opinion for that of the doctor).  Thus, based on his review of the record, the ALJ properly rejected certain limitations in Dr. Baldino's opinion because they were inconsistent with his treatment records.  <u>Plummer</u>, 186 F.3d at 429.  Based on these considerations, the ALJ was justified in giving Dr. Baldino's opinion "partial weight," and that finding was supported by substantial evidence.

### 2. Dr. Pinkard

Dr. Pinkard performed an internal medicine consultative examination on September 10, 2014.  R. at 431-45.  She reported that Witherspoon had a history of low back pain for approximately three months, resulting from "eight spinal taps in one day" in May 2014.  <u>Id.</u> at 431.  Witherspoon reported burning pain in his lower back that he described as "10/10 constant." <u>Id.</u>  Witherspoon advised that the pain was made worse with standing too long, sitting too long, and walking too long.  <u>Id.</u>  Dr. Pinkard reported that Witherspoon did not use an assistive device. <u>Id.</u>  Witherspoon indicated that he cooked, cleaned, did laundry, shopped, showered and dressed himself.  <u>Id.</u> at 432.  Dr. Pinkard noted that Witherspoon did not appear to be in any acute distress at the examination.  <u>Id.</u>  His gait was normal and he could walk on his heels without difficulty, although he walked on his toes with difficulty.  <u>Id.</u>  His squat was full, his stance was normal, and he used no assistive devices.  <u>Id.</u>  He needed no help changing for the exam or getting on and off the exam table, and he was able to rise from the chair without difficulty.  <u>Id.</u>

He had no scoliosis, kyphosis, or abnormality in the thoracic spine. Id. at 433. Witherspoon had

a positive straight leg raise at 45 degrees in the bilateral legs, however "neither leg [wa]s

confirmed sitting." Id. He had no evidence of joint deformity, redness, heat, or effusion, and his

joints were stable and nontender. Id. He had no cyanosis, clubbing, edema, significant

varicosities, or trophic changes, and no muscle atrophy was evident. Id. Dr. Pinkard diagnosed

Witherspoon with: (1) low back pain; (2) bilateral knee pain; and (3) history of depression and

bipolar disorder. Id. at 434. His prognosis was "fair." Id.

Dr. Pinkard attached reports from x-rays of the lumbosacral spine, the right knee, and the

left knee. Id. at 435-36. With respect to the lumbosacral spine x-ray, it was noted that there was

"mild degenerative spondylosis at L2-L3 and L3-L4. There is facet joint arthropathy. There is

no compression fracture. There is a transitional L5 vertebral body." Id. at 436. The

"impression" was "degenerative changes." Id. X-rays for both the right and left knee showed

that there was "no evidence of acute fracture, dislocation or destructive bony lesion. The joint

spaces are relatively well maintained." Id. The "impression" for both knees was "[n]egative

radiographic examination." Id. at 435-36.

Dr. Pinkard completed a "Medical Source Statement of Ability to Do Work-Related

Activities (Physical)." Id. at 439-44. She opined that Witherspoon could occasionally lift up to

10 pounds, but never lift anything greater, and could never carry any weight. Id. at 439. She

determined that Witherspoon could sit for four hours and stand and walk for one hour each at

one time in an eight-hour workday, and could sit for a total of five hours, stand for a total of one

hour, and walk for a total of one hour in an eight-hour workday. Id. at 440. Dr. Pinkard did not

remark whether Witherspoon required the use of a cane to ambulate. Id. She opined that

Witherspoon could occasionally reach and push or pull, and frequently handle, finger, and feel

with his hands.  Id. at 441.  He could occasionally operate foot controls with his feet.  Id.  Dr.

Pinkard determined that Witherspoon could never climb ladders or scaffolds, kneel, crouch, or

crawl, could occasionally climb stairs and ramps, and could continuously balance.  Id. at 442.

Dr. Pinkard further indicated that he could never tolerate unprotected heights, moving

mechanical parts, operating a motor vehicle, dust, odors, fumes, or pulmonary irritants; and that

he could occasionally tolerate humidity and wetness, extreme heat, and vibrations.  Id. at 443.

Finally, Dr. Pinkard opined that Witherspoon could perform activities like shopping; travel

without a companion for assistance; ambulate without using a wheelchair, walker, or two canes

or crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public

transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a

simple meal and feed himself; care for personal hygiene; and sort, handle, and use paper or files.

Id. at 444.

 The ALJ afforded Dr. Pinkard's opinion "little weight."  Id. at 23.  In support of this

finding, the ALJ found that "[t]he sedentary residual functional capacity assessed is not

consistent with the generally mild medical findings on physical examination and testing and the

record of minimal treatment for the back."  Id.  As an initial matter, a consultative examiner's

opinion is never entitled to controlling weight.  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Moreover, as explained by the ALJ, the limitations Dr. Pinkard assessed were not supported by

the results of the consultative examination.  It was noted that Witherspoon did not use an

assistive device.  R. at 431.  He reported that he did cooking, cleaning, laundry, shopping,

showering, and dressing as needed.  Id. at 432.  Dr. Pinkard determined that Witherspoon

appeared to be in no acute distress, had a normal gait, walked on his heels without difficulty, and

had a full squat and a normal stance.  Id.  He needed no help changing for the exam or getting on

and off the exam table and was able to rise from a chair without difficulty. Id. He had no scoliosis, kyphosis, or abnormality in the thoracic spine. Id. at 433. Although Witherspoon had a positive straight leg raise test at 45 degrees in the bilateral legs, "neither leg [wa]s confirmed sitting." Id. There was no evidence of joint deformity and his joints were stable and nontender. Id. His strength was "5/5" in the upper and lower extremities. Id. He was diagnosed with "[l]ow back pain" and "[b]ilateral knee pain" and his prognosis was listed as "[f]air." Id. at 434. Based on these examination findings, the ALJ's conclusion that Dr. Pinkard's "sedentary range physical residual functional capacity . . . [wa]s not representative of the overall mild physical findings on exam and testing," id. at 20, was unequivocally supported by substantial evidence.[5]

---

[5] Witherspoon argues that the ALJ erred in only giving partial weight to the opinions of Dr. Baldino and Dr. Pinkard absent any contradictory medical opinion in the record. Pl.'s Br. at 9. Ultimately, however, determining a claimant's RFC is the province of the ALJ and not of the treating physician. An ALJ is required to conduct an independent analysis of the relevant evidence and to reach his or her own determination regarding the claimant's RFC. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). As the United States Court of Appeals for the Third Circuit has articulated:

> The ALJ—not treating or examining physicians or State agency consultants— must make the ultimate disability and RFC determinations. See 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c). Although treating and examining physician opinions often deserve more weight than the opinions of doctors who review records, see, e.g., 20 C.F.R. § 404.1527(d)(1)-(2), "[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity."

Id. (quoting Brown v. Astrue, 649 F.3d 193, 197 n.2 (3d Cir. 2011)). Thus, the ALJ's role is not merely to choose between the opinions of various medical sources. "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC. Surveying the medical evidence to craft an RFC is part of the ALJ's duties." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); see also Chandler, 667 F.3d at 362 (ALJ could extrapolate based on the evidence of record because every fact incorporated in an RFC does not need to have been found by a medical expert). The ALJ is not prohibited from making an RFC assessment even if no doctor has specifically made the same findings and even if the only medical opinion in the record is to the contrary. See, e.g., Cummings v. Colvin, 129 F. Supp. 3d 209, 215 (W.D. Pa. 2015); see also, e.g., Butler v. Colvin, No. 3:15-CV-1923, 2016 WL 2756268, at *13 n.6 (M.D. Pa. May 12, 2016); Doty v. Colvin, No. 13-80-J, 2014 WL

(Footnote continued on next page)

**C.     The ALJ's Evaluation of Witherspoon's Mental Impairments Is Supported by Substantial Evidence**

Witherspoon argues that the ALJ improperly discounted the nature and extent of his severe mental impairments. Pl.'s Br. at 10-14. This claim is meritless.

At step two of the sequential evaluation, the ALJ determined that Witherspoon had the severe impairment of depression. R. at 17. Accordingly, the ALJ analyzed whether Witherspoon met the "B" criteria for Listing 12.04 (Depressive, bipolar and related disorders) – the criteria for determining the extent of the functional limitations that the claimant suffers as a result of the various categories of mental disorders. See id. at 18; see also 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04. In doing so, the ALJ determined that Witherspoon had moderate limitations in understanding, remembering, or applying information; mild limitations in interacting with others; mild limitations with regard to concentrating, persisting, or maintaining pace; and mild limitations in adapting and managing oneself. R. at 18. Therefore, the ALJ determined that he did not meet or medically equal listing 12.04. Id. With respect to his RFC, the ALJ found that Witherspoon was "capable of sustaining attention for at least two-hour increments throughout an eight-hour workday. He cannot understand, remember or apply complex instructions or work procedures. He possesses the ability to adapt and manage himself sufficiently to tolerate usual work conditions and understand, remember and apply routine work procedures and instructions. He is capable of interacting with coworkers, supervisors, and the

29036, at *1 n.1 (W.D. Pa. Jan. 2, 2014); but see Kester v. Colvin, No. 3:13-CV-02331, 2015 WL 1932157, at *2-3 (M.D. Pa. Apr. 21, 2015) (finding that "the ALJ should have based her RFC decision on at least one physician's opinion"). Substantial evidence reflecting that Witherspoon consistently had normal ranges of motion and the ability to stand and walk without difficulty or the use of assistive devices supports the ALJ's RFC limiting Witherspoon to light work and the ALJ's rejection of portions of Dr. Baldino's and Dr. Pinkard's opinions which provided for work-preclusive limitations.

public on a less than frequent but more than occasional basis." Id. at 19. After reviewing the record, the ALJ concluded that "the evidence supports overall moderate severity limitations that still allow for performance of simple routine work with an ability to deal with coworkers, supervisors and the public on a less than frequent but more than occasional basis." Id. at 21. This assessment of Witherspoon's mental health impairments is supported by substantial evidence.[6]

---

[6] To the extent Witherspoon argues that the ALJ erred in only identifying depression, and not additional mental health impairments, as a severe impairment at step two of the sequential analysis, see Pl.'s Br. at 10, his claim fails. Step two of the analysis serves as a de minimis screening device meant to dispose of groundless claims. Newell v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2003). While a finding that a claimant has no severe impairments would terminate the inquiry, if an ALJ finds that the claimant has any severe impairment, the ALJ must continue the analysis through formulation of the claimant's RFC at step four. Sherrod v. Barnhart, No. CIV. A. 01-4731, 2002 WL 31429337, at *4 (E.D. Pa. Oct. 29, 2002). In formulating the claimant's RFC, the ALJ must take into account the limitations imposed by all of the claimant's impairments, including both severe and non-severe impairments. Id.; 20 C.F.R. §§ 404.1545(e), 416.945(e). As a result, as long as the ALJ finds that the claimant has at least one severe impairment and, therefore, continues the analysis past step two, any error in failing to find another impairment or impairments severe is harmless. Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 145 n.2 (3d Cir. 2007).

Here, the ALJ did not screen out Witherspoon's claim at step two but, instead, found that he suffered from the severe impairments of depression and degenerative disorders of the spine. R. at 17. The ALJ continued to address Witherspoon's mental health limitations in formulating his RFC and, accordingly, any error in not separately identifying another, related mental health disorder as one of his severe mental impairments was harmless error. This is especially the case when applied to mental impairments because of their overlapping symptoms and the possibility of multiple characterizations of a patient's mental health disorder. The Commissioner's Listing of Mental Health Disorders applies differing criteria (the "A" criteria) to the determination of whether a claimant suffers from one of the various categories of mental health conditions that it describes. See generally 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00. The criteria for determining the extent of the functional limitations that the claimant suffers as a result of the various categories of mental disorders (the "B" criteria), however, are identical. Fleetwood v. Berryhill, No. 3:17-CV-1796, 2018 WL 2461762, at *6 (M.D. Pa. June 1, 2018); Cruz v. Comm'r of Soc. Sec., No. CV 15-954 (SRC), 2016 WL 2624914, at *2 (D.N.J. May 9, 2016). It is, therefore, quite common for courts to engage in a single analysis of a claimant's mental health limitations by applying a single, combined analysis of the B criteria to claimants who claim disability based

(Footnote continued on next page)

As the ALJ summarized, id. at 20-23, Witherspoon lost his job as a security guard in 2008 because his contract was not renewed, see, e.g., id. at 383, 385-87. He was unemployed for two years and then stopped looking for work so that he could care for his wheelchair-bound mother who suffered from Alzheimer's and relied on Witherspoon as her primary caretaker. Id. at 385-87, 401. Treatment notes from Belmont Center for Comprehensive Treatment ("Belmont") reported that rapport with Witherspoon and the treatment provider was easily established and maintained and he presented himself as a very engaging, verbal, and outgoing person. Id. at 386. His speech was clear and goal-directed and there was no clear evidence of any disturbance of thought. Id. He was noted to be quite verbal, often going into great detail about many things and seemed to speak in a comfortable, easy tone. Id. Although he admitted he was sad and anxious, he presented as pleasant. Id. at 387. His affect was congruent and full-range. Id. He was alert and oriented, and there was no indication of any cognitive deficits. Id. During his treatment at Belmont, he expressed the desire to work. Id. at 401.

On January 12, 2015, a different mental health treatment provider, Community Council Health Systems ("CCHS"), identified him as seeking mental health services for the first time. Id.

on both depressive, bipolar or related disorders (Listing 12.04) and anxiety or obsessive-compulsive disorders (Listing 12.06). See, e.g., Fleetwood, 2018 WL 2461762, at *6; Cruz, 2016 WL 2624914, at *2; Volage v. Astrue, No. 11-CV-4413 ES, 2012 WL 4742373, at *4 (D.N.J. Oct. 1, 2012). As one court aptly summarized: "Plaintiff presents no logical reasoning or legal support as to why, given that the 'B criteria' are mandatory for a finding of disability under the Listings and the ALJ found the 'B criteria' were not met, the ALJ needed to discuss the 'A criteria.'" Ortiz v. Colvin, No. CV 14-4805, 2016 WL 164995, at *9 (D.N.J. Jan. 14, 2016); see also Brumwell v. Astrue, No. CIV.A. 06-696-JJF, 2008 WL 843466, at *9 (D. Del. Mar. 28, 2008) ("Therefore, if Plaintiff could not meet the 'B' criteria for Listing 12.04, she could not meet that same criteria for Listing 12.06, regardless of whether she met the 'A' criteria for Listing 12.06."). Therefore, to the extent Witherspoon argues that his case should be remanded because the ALJ failed to separately identify the varied mental health diagnoses that may have appeared in his medical records as distinct severe impairments, his claim does not warrant remand.

at 448. It was noted that he was not currently taking any medications. Id. Witherspoon's behavior was described as anxious, but he "made good eye contact." Id. at 451. As the ALJ summarized, the remaining mental status examination findings were relatively normal. See id. at 451-52 (noting that Witherspoon was appropriately dressed, had assertive behavior, good eye contact, normal motor behavior, cooperative and open attitude, normal speech characteristics, normal concentration and attention, no orientation impairment, no delusions or hallucinations or obsessions, normal thought processes, logical associations, average fund of information, good judgment, and normal insight). It was recommended that he receive adult outpatient services, psychiatric evaluation, and individual therapy. Id. at 453. However, his prognosis was "Full Remission." Id. On May 25, 2016, after approximately a year and a half of treatment at CCHS, Witherspoon's medical records indicated that he "had a good response to meds" and was "[c]urrently not depressed, and anxiety is contained." Id. at 551; see also id. ("He has not been depressed. His anxiety has been contained. He has been stable. There has not been any problem with attendance or compliance."). At this time he had a normal mental status evaluation, where his appearance and general description was noted to be neat, calm, and cooperative; he was oriented to person, place, and time; his level of consciousness was "alert"; his cognitive ability was good; he was noted to "relate[] well" with respect to his social skills; his mood was neutral; his affect was appropriate; his speech was normal; he had no delusions; and his judgment and insight were good. Id. at 552. His prognosis was listed as "[f]air." Id.[7]

---

[7] Witherspoon cites to Morales to undermine the ALJ's reliance on these medical records, particularly the notation that Witherspoon was "stable." Pl.'s Br. at 11-12 (citing Morales, 225 F.3d at 319); R. at 551. In Morales, a physician opined that a claimant with a mental impairment was markedly limited in a number of work-related activities, but the ALJ rejected the physician's opinion, which was supported by two other opinions from treating medical sources, in part

(Footnote continued on next page)

The ALJ did not discount Witherspoon's mental impairments and their effects on his functional abilities. The ALJ concluded that "the evidence supports overall moderate severity limitations." Id. at 21. The ALJ acknowledged how an examining doctor characterized him as "narcissistic," and how he appeared anxious and talkative during a mental status examination. Id. at 22. The ALJ further noted that Witherspoon was assessed a GAF score of 50[8] during his initial contact with CCHS, but that this was assessed "at the commencement of treatment at the time [when he] was taking no medication." Id. (citing id. at 448-53). The ALJ also noted that CCHS records documented that he was depressed and had a "hopeless angry mood." Id. (citing id. at 540-74). To the extent Witherspoon argues that the ALJ erred in failing to highlight certain aspects of his mental health treatment records, "an ALJ is not required to cite every piece of evidence in the record." Pintal v. Comm'r of Soc. Sec., 602 F. App'x 84, 88 (3d Cir. 2015);

---

because the physician also noted that the claimant was "stable with medication." 225 F.3d at 319. The Third Circuit held that the ALJ erred because a treating physician's opinion indicating marked limitations cannot be supplanted by a mere notation that the claimant is "stable." Id. In this case, however, the ALJ did not discredit a treating physician's opinion by making speculative inferences from medical reports, as was problematic in Morales. In his review of Witherspoon's treatment records, the ALJ noted that the treatment records documented "moderate range findings and more recently show[ed] improved mental status." R. at 22. Unlike in Morales, the ALJ did not use the notation that Witherspoon was stable to discount a physician's opinion that he had marked functional limitations. Indeed, no one from CCHS provided a medical source statement regarding Witherspoon's functional abilities or limitations as a result of his impairments. Thus, the ALJ did not employ the problematic logic discussed in Morales, and substantial evidence supported the ALJ's review of Witherspoon's mental impairments.

[8]    "A 'GAF' score is a 'numerical summary of a clinician's judgment of [an] individual's overall level of functioning.'" Rivera v. Astrue, 9 F. Supp. 3d 495, 504 (E.D. Pa. 2014) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 32 (4th ed. 2000). A GAF score in the range 41-50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." Lozado v. Barnhart, 331 F. Supp. 2d 325, 330 n.2 (E.D. Pa. 2004) (citing DSM-IV).

Mays v. Comm'r of Soc. Sec., 227 F. Supp. 2d 443, 449-50 (E.D. Pa. 2002) ("'[T]he task of this Court in reviewing the ALJ's decision is not to determine whether [the ALJ] explicitly mentioned every piece of evidence in [the] opinion (a requirement that would impose an almost impossible burden not only on ALJs but also on reviewing courts), but rather to determine whether the ALJ's findings were supported by substantial evidence.'" (quoting Campbell v. Shalala, No. 93-cv-0181, 1993 WL 452039, at *11 n.3 (E.D. Pa. Nov. 1, 1993))). Here, the ALJ's decision demonstrates that he reviewed all of the pertinent evidence of record and gave it meaningful consideration.

Moreover, in crafting the RFC, the ALJ gave significant weight to the State agency opinion of psychologist Michael Suminski, Ph.D. R. at 22. Dr. Suminski determined that Witherspoon was capable of making simple decisions and had adequate ability for performing simple tasks with few changes in routine. Id. (citing id. at 59-67). The ALJ found that this opinion was "generally supported by information and findings in [Witherspoon's] mental health records." Id. Witherspoon attacks the ALJ's reliance on the State agency opinion because it pre-dates the CCHS treatment notes in the record. Pl.'s Br. at 13. The opinions of non-examining State Agency consultants, however, merit significant consideration. Chandler, 667 F.3d at 361. The Third Circuit has clearly stated that "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." Id. Moreover, the ALJ reviewed the records from CCHS, which indicated that, instead of a worsening condition, Witherspoon was improving over the course of a year and a half of treatment. R. at 551. "The fact that the state agency physician did not have access to the entire evidentiary record—because the record was

incomplete at the time of the assessment—is inconsequential [if] the ALJ considered the entire evidentiary record and substantial evidence supports his [or her] determination." Hopkins v. Colvin, No. 15-440, 2015 WL 7012533, at *2 (W.D. Pa. Nov. 12, 2015) (quoting Thacker v. Astrue, No. 3:11CV246-GCM-DSC, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011)). Therefore, the ALJ did not err in affording significant weight to the State agency opinion.

Witherspoon also maintains that the ALJ erred by failing to evaluate the Adult Third-Party Function Report completed by Winifred Hicks, Witherspoon's sister. Pl.'s Br. at 12-13; R. at 180-87. In Burnett, the Third Circuit held that "the law requires the ALJ to consider and weigh all relevant evidence, including nonmedical evidence from spouses, parents, other relatives, friends, and neighbors." 220 F.3d at 122. Nevertheless, "[i]n many cases, courts have found that an ALJ's failure to address lay opinion testimony, although technically in violation of applicable legal standards, did not require remand since the testimony would not have changed the outcome of the case." Butterfield v. Astrue, No. 06-0603, 2011 WL 1740121, at *6 (E.D. Pa. May 5, 2011) (collecting cases); see also Crosby v. Barnhart, 98 F. App'x 923, 926 (3d Cir. 2004). Here, even if the ALJ did not consider the third-party statement from Witherspoon's sister when making his decision, the error is harmless and does not require remand. In her statement, Ms. Hicks described that, although Witherspoon appeared to be depressed and had back problems, he took care of his mother, R. at 181; did not need reminders to take medicine and help his mother with her medications, id. at 182; prepared his own meals, id.; did his own laundry, id.; walked, drove a car, and used public transportation, id. at 183; could go out alone, id.; could shop in stores, id.; could pay bills and count change, id.; watched television, id. at 184; and did not need anyone to accompany him to the doctors or the store, id. She stated that she did not know how much he could lift, how far he could walk before needing to rest, how long he

could pay attention, whether he could finish what he starts, how well he could follow written instructions, or how well he got along with authority figures. Id. at 185-86. She also did not know whether he had ever been fired or laid off from a job because of problems getting along with other people. Id. at 186. When asked how he handled stress, she stated "not well." Id. She stated she did not notice any unusual behavior in Witherspoon. Id.

Instead of bolstering Witherspoon's testimony that he was unable to work due to his impairments, the testimony only referred to Witherspoon's depression and back problems in general terms, and largely confirmed that Witherspoon's impairments did not impact his ability to perform day-to-day activities and care for his mother. See id. at 180-86. Often when asked about Witherspoon's abilities, his sister replied that she did not know. See id. In fact, the sister's statements that Witherspoon was capable of handling a variety of activities and tasks was not inconsistent with the ALJ's determination that Witherspoon could perform a limited range of light work with various non-physical limitations. Accordingly, "the ALJ's failure to explicitly assess the lay witness statement[] constitutes harmless error because the lay witness statement[] d[id] 'not reveal anything new which would cause the ALJ to discount the contrary medical evidence.'" Middleton v. Colvin, No. 2:15-cv-1419, 2016 WL 244930, at *3 (E.D. Pa. Jan. 31, 2016) (quoting Bailey v. Astrue, No. 07-4595, 2009 WL 577455, at *11 (E.D. Pa. Mar. 4, 2009)) (additional internal quotation marks omitted); see also Privette-James v. Colvin, No. 12-cv-610, 2015 WL 4743769, at *2 (E.D. Pa. Aug. 11, 2015). Remand, therefore, is not warranted here.

### D. The ALJ's Evaluation of Witherspoon's Obesity and Fatigue is Supported by Substantial Evidence

Witherspoon argues that the ALJ erred by failing to consider the impact of his obesity and fatigue on his ability to perform light work activity. Pl.'s Br. at 14-16. These arguments lack merit.

Although the ALJ did not mention obesity in his analysis, in <u>Rutherford</u>, the Third Circuit "held that an ALJ's failure to mention a claimant's obesity does not warrant remand where the claimant has not expressly relied on obesity as a basis for establishing functional limitations during the course of the administrative proceedings, and where a claimant only offers a very generalized assertion that obesity makes basic activities more difficult than they would be otherwise." <u>McKean v. Colvin</u>, 150 F. Supp. 3d 406, 416 (M.D. Pa. 2015) (citing <u>Rutherford</u>, 399 F.3d at 552-53). Specifically, in <u>Rutherford</u>, the claimant argued that the ALJ failed to consider her obesity, a condition present in her medical records. 399 F.3d at 552-53. The Third Circuit found, however, that the claimant never mentioned obesity as a condition that contributed to her inability to work, even when directly asked. <u>Id.</u> at 553. Moreover, the Third Circuit determined that a "generalized" assertion that "her weight makes it more difficult to stand [and] walk . . ." was insufficient to require a remand where the record indicated that the ALJ "relied on the voluminous medical evidence as a basis for his findings regarding her limitations and impairments." <u>Id.</u>

Here, as in <u>Rutherford</u>, when asked by the ALJ to identify Witherspoon's impairments, his attorney did not mention obesity, nor did Witherspoon himself identify obesity throughout the hearing. <u>See</u> R. at 34-52. Nor does Witherspoon point to any medical evidence that would indicate limitations caused by obesity in excess of those found by the ALJ. His only references to his obesity in the record are brief notations of his Body Mass Index, with a generic, generalized description of the variety of increased risks associated with being overweight or obese. <u>See id.</u> at 265, 468, 490, 497-98. Witherspoon also references instances when his psychiatrist noted that Witherspoon was "counseled on[] [h]ealthy [e]ating," but made no mention of obesity. <u>See id.</u> at 547, 549, 554, 556, 558, 560, 562, 564, 566, 568, 570. None of

these notations in the record identify any ways in which his obesity impacted his functional limitations.  Therefore, to the extent the ALJ erred in failing to address Witherspoon's obesity, any such error was harmless and does not warrant a remand.  See Rutherford, 399 F.3d at 552-53; see also, e.g., Jones v. Colvin, No. 11-6698, 2013 WL 5468305, at *1 (E.D. Pa. Oct. 1, 2013) (finding failure to adequately address claimant's obesity harmless error where claimant "failed to mention obesity when the ALJ asked him why he was unable to work").

Witherspoon's claims regarding the ALJ's purported failure to address the impact of his fatigue on his ability to perform sustained work activity similarly do not warrant remand.   The references to fatigue in the record are minimal.  Witherspoon occasionally reported "sleep problems" to his psychiatrist, see, e.g., R. at 448, 551, 572, but there is no indication from his medical providers that his sleep problems or reports of fatigue resulted in any functional limitations.  Moreover, although Witherspoon indicated in his function report that he experienced drowsiness from taking Xanax, see id. at 178, his medical records do not support his contention. See, e.g., id. at 551 ("He has a good response to meds."); id. at 570 ("Thinks that meds have, thus far, been a big help.  He says that he has been able to sleep, and his anxiety has decreased considerably.").  Witherspoon relies on Dr. Baldino's opinion that he would miss four days of work or more per month and that Witherspoon would need to lie down every 10 to 20 minutes during an eight-hour working shift.  Pl.'s Br. at 15 (citing R. at 576-77).  Dr. Baldino, however, expressly indicated in his opinion that these restrictions were due to "L5 radiculopathy," as opposed to issues with fatigue.  R. at 576-77.  Furthermore, Dr. Baldino did not mention fatigue anywhere in his opinion.  Id.  Ultimately, the burden is on Witherspoon to establish limitations beyond those already incorporated into the ALJ's RFC findings.  Here, Witherspoon has failed to establish that his complaints of fatigue resulted in any additional work-related limitations.

## V.     <u>CONCLUSION</u>

For the reasons set forth above, I find that the ALJ's findings are supported by substantial evidence. Accordingly, Plaintiff's Request for Review is denied. An appropriate Order follows.

Dated: October 15, 2019

BY THE COURT:


*/s/ Marilyn Heffley*
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE